IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL NO. 1203 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | |
| SHEILA BROWN, et al. | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 99-20593 |
| AMERICAN HOME PRODUCTS CORPORATION | ) ) ) | 2:16 MD 1203 |

MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 8928

Bartle, J.                                              August 22, 2012

        Evelyn N. Philbeck ("Ms. Philbeck" or "claimant"), a
class member under the Diet Drug Nationwide Class Action
Settlement Agreement ("Settlement Agreement") with Wyeth,[1] seeks
benefits from the AHP Settlement Trust ("Trust").  Based on the
record developed in the show cause process, we must determine
whether claimant has demonstrated a reasonable medical basis to
support her claim for Matrix Compensation Benefits ("Matrix
Benefits").[2]

───────────────────

1.  Prior to March 11, 2002, Wyeth was known as American Home
Products Corporation.

2.  Matrix Benefits are paid according to two benefit matrices
(Matrix "A" and Matrix "B"), which generally classify claimants
for compensation purposes based upon the severity of their
medical conditions, their ages when they are diagnosed, and the
presence of other medical conditions that also may have caused or
contributed to a claimant's valvular heart disease ("VHD").  See
Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2).  Matrix A-1
                                                   (continued...)

To seek Matrix Benefits, a claimant must first submit a completed Green Form to the Trust.  The Green Form consists of three parts.  The claimant or the claimant's representative completes Part I of the Green Form.  Part II is completed by the claimant's attesting physician, who must answer a series of questions concerning the claimant's medical condition that correlate to the Matrix criteria set forth in the Settlement Agreement.  Finally, claimant's attorney must complete Part III if claimant is represented.

Under the Settlement Agreement, only eligible claimants are entitled to Matrix Benefits.  Generally, a claimant is considered to be eligible for Matrix Benefits if he or she is diagnosed with mild or greater aortic and/or mitral regurgitation by an echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period.[3]  See Settlement Agreement §§ IV.B.1.a. & I.22.

In October, 2009, claimant submitted a completed Green Form to the Trust signed by her attesting physician, Gregory R.

---

2.  (...continued)
describes the compensation available to Diet Drug Recipients with serious VHD who took the drugs for 61 days or longer and who did not have any of the alternative causes of VHD that made the B matrices applicable.  In contrast, Matrix B-1 outlines the compensation available to Diet Drug Recipients with serious VHD who were registered as having only mild mitral regurgitation by the close of the Screening Period or who took the drugs for 60 days or less or who had factors that would make it difficult for them to prove that their VHD was caused solely by the use of these Diet Drugs.

3.  See Settlement Agreement § IV.A.1.a. (Screening Program established under the Settlement Agreement).

-2-

Boxberger, M.D.  Based on an echocardiogram dated
September 8, 2008,[4] Dr. Boxberger attested in Part II of
Ms. Philbeck's Green Form that she suffered from severe mitral
regurgitation, mitral valve prolapse, and chordae tendinae
rupture.[5]  In addition, Dr. Boxberger attested that claimant had
surgery to repair or replace the aortic and/or mitral valve(s)
following use of Pondimin® and/or Redux™.[6]  Based on such
findings, claimant would be entitled to Matrix B-1, Level III
benefits in the amount of $131,589.[7]

   In the reports of claimant's March 7, 2002 and
December 18, 2002 echocardiograms, the reviewing cardiologist,
C. K. Lai, M.D., F.A.C.C., indicated that claimant had mild

---

4.  Because claimant's September 8, 2008 echocardiogram was
performed after the end of the Screen Period, claimant relied on
echocardiograms dated March 7, 2002 and December 18, 2002 to
establish her eligibility to Matrix Benefits.

5.  The presence of either mitral valve prolapse or chordae
tendinae rupture requires the payment of reduced Matrix Benefits
for a claim based on damage to the mitral valve.  See Settlement
Agreement §§ IV.B.2.d.(2)(c)ii)b) & IV.B.2.d.(2)(c)ii)c).

6.  Dr. Boxberger also attested that claimant suffered from
pulmonary hypertension secondary to moderate or greater mitral
regurgitation, an abnormal left atrial dimension, a reduced
ejection fraction in the range of 50% to 60%, and New York Heart
Association Functional Class IV symptoms.  These conditions are
not at issue in this claim.

7.  Under the Settlement Agreement, an eligible claimant is
entitled to Level III benefits if he or she suffers from "left
sided valvular heart disease requiring ... [s]urgery to repair or
replace the aortic and/or mitral valve(s) following use of
Pondimin® and/or Redux™."  See Settlement Agreement
§ IV.B.2.c.(3)(a).  As the Trust concedes that Ms. Philbeck has
met these requirements, the only issue is whether she is eligible
for benefits.

-3-

mitral regurgitation.  Dr. Lai, however, did not specify a percentage as to the level of claimant's mitral regurgitation. Under the definition set forth in the Settlement Agreement, mild mitral regurgitation is defined as "(1) either the RJA/LAA ratio is more than five percent (5%) or the mitral regurgitation jet height is greater than 1 cm from the valve orifice, and (2) the RJA/LAA ratio is less than twenty percent (20%)."  Settlement Agreement § I.38.

In October, 2009, the Trust forwarded the claim for review by Robert L. Gillespie, M.D., F.A.C.C., F.A.S.E., one of its auditing cardiologists.  In audit, Dr. Gillespie concluded that there was no reasonable medical basis for finding mild mitral regurgitation based on claimant's March 7, 2002 or December 18, 2002 echocardiograms.  Specifically, Dr. Gillespie determined:

> Review of the apical views showed trace
> [mitral regurgitation] with Nyquist Limit set
> at appropriate level i.e. ≥ 50 cm/sec.  At
> Nyquist Limit set at 40 cm/sec is the only
> time [mitral regurgitant] jet is seen in the
> mild range.  The parasternal views showed no
> [mitral regurgitation].  Review of the study
> done on 3/7/02 showed trace [mitral
> regurgitation] also.

Based on the auditing cardiologist's finding, the Trust issued a post-audit determination denying Ms. Philbeck's claim. Pursuant to the Rules for the Audit of Matrix Compensation Claims ("Audit Rules"), claimant contested this adverse determination.[8]

_____

8.  Claims placed into audit on or before December 1, 2002 are
(continued...)

In contest, claimant argued that both her March 7, 2002 and
December 18, 2002 echocardiograms demonstrated mild mitral
regurgitation.  In support, Ms. Philbeck submitted an affidavit
of Roger W. Evans, M.D., who concluded:

> Claimant's echocardiogram tape of 03/07/2002
> shows "mild" mitral valve regurgitation with
> a RJA/LAA ratio of 10%.  This is seen in the
> long axis views and in the 4-chamber view.
> In my opinion, the attesting physician had a
> "reasonable medical basis" to conclude that
> this echocardiogram tape shows "mild" mitral
> valve regurgitation when answering Question
> C.3.a. in Part II of the Green Form.
>
> ....
>
> Claimant's echocardiogram tape of 12/18/2002
> shows "mild" mitral valve regurgitation with
> a RJA/LAA ratio of 10%.  The jet extends 2 cm
> from the valve orifice into the left atrium.
> In my opinion, the attesting physician had a
> "reasonable medical basis" to conclude that
> this echocardiogram tape shows "mild" mitral
> valve regurgitation when answering Question
> C.3.a. in Part II of the Green Form.

The Trust then issued a final post-audit determination,
again denying Ms. Philbeck's claim.  Claimant disputed this final
determination and requested that the claim proceed to the show
cause process established in the Settlement Agreement.  See
Settlement Agreement § VI.E.7.; PTO No. 2807, Audit Rule 18(c).
The Trust then applied to the court for issuance of an Order to

---

8.  (...continued)
governed by the Policies and Procedures for Audit and Disposition
of Matrix Compensation Claims in Audit, as approved in Pretrial
Order ("PTO") No. 2457 (May 31, 2002).  Claims placed into audit
after December 1, 2002 are governed by the Audit Rules, as
approved in PTO No. 2807 (Mar. 26, 2003).  There is no dispute
that the Audit Rules contained in PTO No. 2807 apply to
Ms. Philbeck's claim.

show cause why Ms. Philbeck's claim should be paid.  On
April 9, 2010, we issued an Order to show cause and referred the
matter to the Special Master for further proceedings.  <u>See</u> PTO
No. 8456 (Apr. 9, 2010).

        Once the matter was referred to the Special Master, the
Trust submitted its statement of the case and supporting
documentation.  Claimant then served a response upon the Special
Master.  The Trust submitted a reply on November 17, 2010.  Under
the Audit Rules, it is within the Special Master's discretion to
appoint a Technical Advisor[9] to review claims after the Trust and
claimant have had the opportunity to develop the Show Cause
Record.  <u>See</u> Audit Rule 30.  The Special Master assigned a
Technical Advisor, Gary J. Vigilante, M.D., F.A.C.C., to review
the documents submitted by the Trust and claimant and to prepare
a report for the court.  The Show Cause Record and Technical
Advisor Report are now before the court for final determination.
<u>See</u> <u>id.</u> Rule 35.

        The issue presented for resolution of this claim is
whether claimant has met her burden in proving that there is a
reasonable medical basis for finding that claimant's

_____

9.  A "[Technical] [A]dvisor's role is to act as a sounding board
for the judge-helping the jurist to educate himself in the jargon
and theory disclosed by the testimony and to think through the
critical technical problems." <u>Reilly v. United States</u>, 863 F.2d
149, 158 (1st Cir. 1988).  In a case such as this, where there
are conflicting expert opinions, a court may seek the assistance
of the Technical Advisor to reconcile such opinions.  The use of
a Technical Advisor to "reconcil[e] the testimony of at least two
outstanding experts who take opposite positions" is proper.  <u>Id.</u>

-6-

March 7, 2002 and/or December 18, 2002 echocardiogram(s) demonstrated at least mild mitral regurgitation.  See id. Rule 24.  Ultimately, if we determine that there is no reasonable medical basis for this finding, we must affirm the Trust's final determination and may grant such other relief as deemed appropriate.  See id. Rule 38(a).  If, on the other hand, we conclude that there is a reasonable medical basis for this finding, we must enter an Order directing the Trust to pay the claim in accordance with the Settlement Agreement.  See id. Rule 38(b).

In support of her claim, Ms. Philbeck raises the same arguments she made in contest.  In addition, she asserts that inter-reader variability accounts for the difference in opinion between her cardiologists and the auditing cardiologist and Technical Advisor.

In response, the Trust argues that claimant did not establish a reasonable medical basis for finding mild mitral regurgitation on either the March 7, 2002 or December 18, 2002 echocardiogram as she simply asserts there is a reasonable medical basis because Dr. Evans agrees with Dr. Lai's findings. The Trust also asserts that Ms. Philbeck failed to submit any documentation rebutting Dr. Gillespie's determination that the December 18, 2002 echocardiogram only showed mild mitral regurgitation when the Nyquist limit was inappropriately set.

The Technical Advisor, Dr. Vigilante, reviewed claimant's March 7, 2002 and December 18, 2002 echocardiograms

and concluded that there was a reasonable medical basis for
finding mild mitral regurgitation.  In particular, Dr. Vigilante
determined that:

> Visually, trace to mild mitral regurgitation
> was suggested in the apical views [of the
> March 7, 2002 echocardiogram] with a central
> jet.  In the parasternal long-axis view, I
> was able to determine a thin jet of mitral
> regurgitation in one beat only.  I digitized
> the cardiac cycles in the apical four and two
> chamber views in which the mitral regurgitant
> jet could be best evaluated in the mid
> portion of systole.  I was able to accurately
> planimeter the mitral regurgitation jet in
> the mid portion of systole.  In the apical
> four chamber view, the largest representative
> RJA was 1.5 cm2.  The LAA in the apical four
> chamber view was 19.7 cm2.  Therefore, the
> largest representative RJA/LAA ratio was less
> than 8% consistent with mild mitral
> regurgitation....
>
> ....
>
> In the apical four chamber view [of the
> December 18, 2002 echocardiogram], the
> largest representative RJA in the mid portion
> of [systole] was 1.3 cm per second.  The LAA
> in the apical four chamber view was 20.2 cm2.
> Therefore, the largest representative RJA/LAA
> ratio was 6% in the apical four chamber view
> consistent with mild mitral regurgitation.
>
> ....
>
> In response to Question 1, there is a
> reasonable medical basis for the Attesting
> Physician's answer to Green Form Question
> C.3.a. on the Green Form signed on
> August 10, 2002.  That is, the echocardiogram
> of March 7, 2002 demonstrated mild mitral
> regurgitation with an RJA/LAA ratio of less
> than 8% in the apical four chamber view.
>
> In response to Question 2, there is a
> reasonable medical basis for the Attesting
> Physician's answers to Green Form Question
> C.3.a. on the Green Forms signed on

February 17, 2003 and January 3, 2003.  That
is, the echocardiogram of December 18, 2002
demonstrated mild mitral regurgitation with
an RJA/LAA ratio of approximately 6%.

After reviewing the entire Show Cause Record, we find

that claimant is eligible to receive Matrix Benefits based on

damage to her mitral valve.  The Settlement Agreement states that

the following Class Members are eligible to receive Matrix

Benefits:

Diet Drug Recipients who have been diagnosed
by a Qualified Physician as FDA Positive or
as having Mild Mitral Regurgitation by an
Echocardiogram performed between the
commencement of Diet Drug use and the end of
the Screening Period and who have registered
for further settlement benefits by [May 3,
2003].

Settlement Agreement § IV.B.1.a.  The Settlement Agreement

further defines "FDA Positive" as "mild or greater regurgitation

of the aortic valve and/or moderate or greater regurgitation of

the mitral valve."  See id. § I.22.  Thus, claimant must

establish at least mild mitral regurgitation to be eligible to

seek Matrix Benefits for a claim based on her mitral valve.

In reviewing claimant's record, Dr. Evans and

Dr. Vigilante reviewed the March 7, 2002 and December 18, 2002

echocardiograms and concluded that they both demonstrated mild

mitral regurgitation.  Specifically, Dr. Evans concluded that

each echocardiogram demonstrated an RJA/LAA ratio of 10%, and

Dr. Vigilante determined that the March 7, 2002 echocardiogram

demonstrated an RJA/LAA ratio of less than 8% and the

December 18, 2002 echocardiogram demonstrated an RJA/LAA ratio of

-9-

6%.  With respect to the December 18, 2002 echocardiogram, Dr. Vigilante noted that he was able to determine the level of claimant's mitral regurgitation despite the Nyquist settings. Despite an opportunity to do so, the Trust does not refute or respond to Dr. Vigilante's conclusions.  As noted previously, mild mitral regurgitation is present where the RJA/LAA ratio is more than five percent (5%) and less than twenty percent (20%). See Settlement Agreement § I.38.

For the foregoing reasons, we conclude that claimant has met her burden of proving that there is a reasonable medical basis for her claim.  Therefore, we will reverse the Trust's denial of Ms. Philbeck's claim for Matrix B-1, Level III benefits.