IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS (PHENTERMINE/ )
FENFLURAMINE/DEXFENFLURAMINE) )    MDL NO. 1203
PRODUCTS LIABILITY LITIGATION )
———————————————————————— )
                              )
THIS DOCUMENT RELATES TO: )
                              )
SHEILA BROWN, et al. )
                              )    CIVIL ACTION NO. 99-20593
        v. )
                              )
AMERICAN HOME PRODUCTS )    2:16 MD 1203
CORPORATION )

**FILED**

FEB -6 2014

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 9203

Bartle, J.                                February 5 , 2014

        Michael Hirschbein ("Mr. Hirschbein" or "claimant") a

class member under the Diet Drug Nationwide Class Action

Settlement Agreement ("Settlement Agreement") with Wyeth,[1] seeks

benefits from the AHP Settlement Trust ("Trust").[2]  Based on the

record developed in the show cause process, we must determine

whether claimant has demonstrated a reasonable medical basis to

support his claim for Matrix Compensation Benefits ("Matrix

Benefits").[3]

———————————————————

1.  Prior to March 11, 2002, Wyeth was known as American Home
Products Corporation.  In 2009, Pfizer, Inc. acquired Wyeth.

2.  Sandra Hirschbein, Mr. Hirschbein's spouse, also has
submitted a derivative claim for benefits.

3.  Matrix Benefits are paid according to two benefit matrices
(Matrix "A" and Matrix "B"), which generally classify claimants
for compensation purposes based upon the severity of their
                                        (continued...)

To seek Matrix Benefits, a claimant must first submit a completed Green Form to the Trust.  The Green Form consists of three parts.  The claimant or the claimant's representative completes Part I of the Green Form.  Part II is completed by the claimant's attesting physician, who must answer a series of questions concerning the claimant's medical condition that correlate to the Matrix criteria set forth in the Settlement Agreement.  Finally, claimant's attorney must complete Part III if claimant is represented.

In June, 2011, claimant submitted a completed Green Form to the Trust signed by his attesting physician, Manoj R. Muttreja, M.D.  Based on an echocardiogram dated May 19, 2002, Dr. Muttreja attested in Part II of Mr. Hirschbein's Green Form that claimant suffered from mild aortic regurgitation and had surgery to repair or replace the aortic and/or mitral valve(s)

---

3.   (...continued)
medical conditions, their ages when they are diagnosed, and the presence of other medical conditions that also may have caused or contributed to a claimant's valvular heart disease ("VHD").  <u>See</u> Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2).  Matrix A-1 describes the compensation available to Diet Drug Recipients with serious VHD who took the drugs for 61 days or longer and who did not have any of the alternative causes of VHD that made the B matrices applicable.  In contrast, Matrix B-1 outlines the compensation available to Diet Drug Recipients with serious VHD who were registered as having only mild mitral regurgitation by the close of the Screening Period or who took the drugs for 60 days or less or who had factors that would make it difficult for them to prove that their VHD was caused solely by the use of these Diet Drugs.

following the use of Pondimin® and/or Redux™.[4]  Based on such findings, claimant would be entitled to Matrix A-1, Level III benefits in the amount of $760,588.[5]

In the report of claimant's November 3, 2010 echocardiogram, the reviewing cardiologist, Ashok K. Agarwal, M.D., F.A.C.C., noted "aortic stenosis" with an "aortic valve area of 0.9 cm square."  Dr. Muttreja, however, attested in claimant's Green Form that Mr. Hirschbein did not suffer from aortic stenosis.  Under the Settlement Agreement, the presence of aortic stenosis, which is defined as "[a]ortic stenosis with an aortic valve area < 1.0 square centimeter by the Continuity Equation," requires the payment of reduced Matrix Benefits.  See Settlement Agreement §  IV.B.2.d.(2)(c)i)e).  As the Trust does not contest Mr. Hirschbein's entitlement to Level III benefits, the only issue before us is whether claimant is entitled to payment on Matrix A-1 or Matrix B-1.

In October, 2011, the Trust forwarded the claim for review by M. Michele Penkala, M.D., one of its auditing cardiologists.  In audit, Dr. Penkala concluded that there was no reasonable medical basis for Dr. Muttreja's finding that claimant

---

4.  Dr. Muttreja also attested that claimant suffered from a reduced ejection fraction in the range of 50% to 60%.  This condition is not at issue in this claim.

5.  Under the Settlement Agreement, a claimant is entitled to Level III benefits if he or she suffers from "left sided valvular heart disease requiring ... [s]urgery to repair or replace the aortic and/or mitral valve(s) following the use of Pondimin® and/or Redux™."  See Settlement Agreement § IV.B.2.c.(3)(a).

did not have aortic stenosis with an aortic valve area of less
than 1.0 square centimeter by the Continuity Equation.   In
support of this conclusion, Dr. Penkala explained:

> Based on the [echocardiogram] study dated
> 11/3/10 the [aortic valve area] was <0.9cm2
> (x gradient 38 mmHg + peak 52 mmHg.)   There
> was no [aortic valve area] mentioned on the
> heart [catheterization] report dated 1/5/11
> but the peak to peak gradient was 40 mmHg.
> At the time of the [intraoperative]
> inspection the [aortic valve] was noted to be
> "a three-leaflet valve, severely stenotic."

Based on Dr. Penkala's finding, the Trust issued a
post-audit determination that Mr. Hirschbein was entitled only to
Matrix B-1, Level III benefits.   Pursuant to the Rules for the
Audit of Matrix Compensation Claims ("Audit Rules"), claimant
contested this adverse determination.[6]   In contest, claimant
argued that the auditing cardiologist erred by finding aortic
stenosis as defined in the Settlement Agreement.   In support,
claimant submitted declarations from Dr. Muttreja and
Paul W. Dlabal, M.D., F.A.C.P., F.A.C.C., F.A.H.A.   In his
declaration, Dr. Muttreja stated, in pertinent part, that:

> 3.   In my opinion, even the 11/03/10
> echocardiogram did not show an aortic valve
> area (AVA) less than 1.0 cm$^2$, and there is a
> reasonable medical basis for this finding.

---

6.   Claims placed into audit on or before December 1, 2002 are
governed by the Policies and Procedures for Audit and Disposition
of Matrix Compensation Claims in Audit, as approved in Pretrial
Order ("PTO") No. 2457 (May 31, 2002).   Claims placed into audit
after December 1, 2002 are governed by the Audit Rules, as
approved in PTO No. 2807 (Mar. 26, 2003).   There is no dispute
that the Audit Rules contained in PTO No. 2807 apply to
Mr. Hirschbein's claim.

4.   On the 11/03/10 echocardiogram, there was only one loop (#55) that showed any gradients using continuous wave doppler recordings. There were only three (3) full signals (beats) and a ½ signal recorded on this loop. The overall quality of the signal recording was poor.  In my opinion, one could not accurately trace the gradients given the quality and faintness of these signals.

5.   On the 11/03/10 echocardiogram, the technician traced the first gradient from the first signal on loop #55.  This gradient grossly appeared to be the highest gradient, and it was likely over-traced by the technician.  As noted by Dr. Penkala, the peak gradient was 52 mmHG and the mean gradient was 38 mmHg.

6.   In choosing a gradient for the Continuity Equation, the cardiologist should review multiple signals or beats, and he/she should choose the signal that is very similar or representative of other signals found throughout the study.  By reviewing multiple signals, the cardiologist will avoid the use of an aberrant gradient, such as one that may result from a premature ventricular contraction or a premature atrial contraction that occurred before the recorded signal.

7.   By using gradients only from the beats that occur regularly, the cardiologist will avoid falsely elevated gradients which will result in erroneous reports of smaller AVAs.

8.   In this case, Dr. Penkala used what appeared to be the highest gradient from the first signal, without regard to whether or not the preceding beat might have created an aberrant gradient.

9.   A more representative doppler signal would be either the second or third signal on loop #55.  Although the gradients from these signals were not traced by the technician, these gradients clearly showed peaks and means that were less than the 52 mmHg and 38 mmHg used by Dr. Penkala.  Therefore, in reasonable medical certainty, the calculated

-5-

AVA would be greater than 1.0 cm² when using
these lower gradients.

10.   The cardiac catheterization confirmed
that the second and third beats (signals)
were more representative of the other beats.
The catheterization report did not provide an
AVA calculated, but it did give a peak-to-
peak gradient of 40 mmHg.  The peak-to-peak
gradient is similar to the peak gradient that
is obtained from the echocardiogram dated
11/03/10, and these two variables should be
within the same range.

11.   The peak-to-peak gradient of 40 mmHg was
markedly lower than the 52 mmHg which was
used by Dr. Penkala.  This peak-to-peak
gradient was much more in line with the
gradient that likely would have been obtained
from the second or third beats (signals) in
loop #55.

12.   As set forth above, in reasonable
medical certainty, the gradients obtained
from the second and third beats would have
yielded a calculated AVA greater than
1.0 cm².  In reasonable medical certainty, if
all of the data from the catheterization were
available, this data would also support a
calculated AVA greater than 1.0 cm².

In his declaration, Dr. Dlabal stated that claimant's

November 3, 2010 echocardiogram demonstrated an aortic valve area

of either 1.1 or 1.2 cm².  In addition, he explained, in

pertinent part, that:

Furthermore, the maximum gradient across the
aortic valve (AoV), derived from this data,
equals 34 mmHg. vs 55 mmHg read by
Dr. Agarwal, which I believe to be derived
from an overestimation of the AoV Velocity
reading above (i.e., he read AoV Velocity =
3.6 M/sec, which is not supported by careful
analysis of the source data).  My
interpretation corresponds to the mean
gradient = 38 mmHg, which was, in fact,
confirmed by Dr. Agarwal.

-6-

In addition, claimant argued that Dr. Penkala improperly relied on a "totality of the medical records and documentation" approach.  (Emphasis omitted).  Finally, Mr. Hirschbein argued that Dr. Penkala was not qualified to serve as an auditing cardiologist.[7]

Although not required to do so, the Trust forwarded the claim to the auditing cardiologist for a second review. Dr. Penkala submitted a declaration in which she again concluded that there was no reasonable medical basis for the attesting physician's representation that Mr. Hirschbein did not have aortic stenosis.  In her declaration, Dr. Penkala stated, in pertinent part, that:

> 9.   I disagree with the conclusion of Drs. Muttreja and Dlabal, that the 11/3/10 study does not demonstrate Aortic Stenosis. As noted by Dr. Muttreja, image #55 demonstrates the [continuous wave] recordings across the [aortic valve].  Although the signal is somewhat faint, it is clearly discernable and very consistent across each of the recordings.  The peak velocity by visual estimate on each signal is very consistent and the signal that the technician chose to trace has a very representative peak velocity of 3.59m/s.  The gradient was not "over traced by the technician" but rather appears quite accurate.  Dr. Muttreja expresses concern that this may have been an "aberrant gradient...may result from a PVC or

_____

7.  Claimant also argued that his claim should not be reduced to Matrix B-1 based on his November 3, 2010 echocardiogram because the Settlement Agreement and the Seventh Amendment dictate that a claim be reduced only when one or more of the enumerated conditions existed at the time claimant was diagnosed as FDA Positive.  We have repeatedly rejected this argument.  See, e.g., PTO No. 8822, at 9-12 (Feb. 22, 2012), aff'd, 525 F. App'x 140 (3d Cir. 2013).

PAC that occurred before the recorded
signal." Given that I did not find any
evidence of ectopy throughout the entire
recording and that the signal, albeit
somewhat faint, was representative of all the
[Continuous Wave] signals. I do not believe
that this is a legitimate concern.

10. I also recalculated the [aortic valve
area] based on the continuity equation, using
my own measurements for the [left ventricular
outflow tract] dimension (21mm) and the peak
[left ventricular outflow tract] velocity of
0.9m/s (which appears to me to be
representative based on clips 50-51), and
utilizing the [aortic vavle] peak of 3.59m/s.
With these very reasonable values I obtained
an [aortic valve area] of 0.86cm², which
meets the Settlement Agreement criteria for
[aortic stenosis].

11. While Dr. Dlabal uses different
velocities in his calculations, I did not
find these to be accurate. I utilized the
[left ventricular outflow tract] peak
velocity of 0.9 cm² from loops 50, 51 and 52
all of which appeared consistent and sampled
from about 3-5mm proximal to the [aortic
valve] per convention.

12. Additionally, the 2D appearance of the
[aortic valve] in both the parasternal long
and short axis views clearly appears very
abnormal with marked calcification and
thickening of the leaflets as well as marked
restriction to opening. In fact it appears
in the short axis view (clip 23) that only
the commissure between the NCC/RCC actually
opens to a reasonable degree.

The Trust then issued a final post-audit determination,
again determining that Mr. Hirschbein was entitled only to
Matrix B-1, Level III benefits. Claimant disputed this final
determination and requested that the claim proceed to the show
cause process established in the Settlement Agreement. See
Settlement Agreement § VI.E.7.; PTO No. 2807, Audit Rule 18(c).

The Trust then applied to the court for issuance of an Order to show cause why Mr. Hirschbein's claim should be paid.  On May 3, 2012, we issued an Order to show cause and referred the matter to the Special Master for further proceedings.  See PTO No. 8866 (May 3, 2012).

Once the matter was referred to the Special Master, the Trust submitted its statement of the case and supporting documentation.  Claimant then served a response upon the Special Master.  The Trust submitted a reply on November 15, 2012, and claimant submitted a sur-reply on December 3, 2012.  Under the Audit Rules it is within the Special Master's discretion to appoint a Technical Advisor[8] to review claims after the Trust and claimant have had the opportunity to develop the Show Cause Record.  See Audit Rule 30.  The Special Master assigned a Technical Advisor, Gary J. Vigilante, M.D., F.A.C.C., to review the documents submitted by the Trust and claimant and to prepare a report for the court.  The Show Cause Record and Technical Advisor Report are now before the court for final determination.  See id. Rule 35.

The issue presented for resolution of this claim is whether claimant has met his burden of proving that there is a

---

8.  A "[Technical] [A]dvisor's role is to act as a sounding board for the judge--helping the jurist to educate himself in the jargon and theory disclosed by the testimony and to think through the critical technical problems."  Reilly v. United States, 863 F.2d 149, 158 (1st Cir. 1988).  In a case such as this, where conflicting expert opinions exist, it is within the discretion of the court to appoint a Technical Advisor to aid it in resolving technical issues.  Id.

reasonable medical basis for the attesting physician's finding
that he did not have aortic stenosis with an aortic valve area of
less than 1.0 square centimeter by the Continuity Equation.  See
id. Rule 24.  Ultimately if we determine that there is no
reasonable medical basis for the answer in claimant's Green Form
that is at issue, we must affirm the Trust's final determination
and may grant such other relief as deemed appropriate.  See id.
Rule 38(a).  If, on the other hand, we determine that there is a
reasonable medical basis for the answer, we must enter an Order
directing the Trust to pay the claim in accordance with the
Settlement Agreement.  See id. Rule 38(b).

       In support of his claim, Mr. Hirschbein reasserts many
of the arguments he raised in contest.  In addition, he argues
that Dr. Penkala concealed evidence and relied on "outlier"
measurements that were not representative to calculate his aortic
valve area.  In support, Mr. Hirschbein submitted a supplemental
declaration of Dr. Dlabal, along with a still-frame image
purporting to support his opinion.

       In response, the Trust argues that the auditing
cardiologist did not improperly rely on Mr. Hirschbein's cardiac
catheterization study and other medical documentation because she
specifically determined that claimant's November 3, 2010
echocardiogram demonstrated aortic stenosis as defined by the
Settlement Agreement.  In addition, the Trust contends that
claimant has failed to provide a reasonable medical basis for
Dr. Muttreja's representation to the contrary.

The Technical Advisor, Dr. Vigilante, reviewed
claimant's echocardiogram and concluded that there was no
reasonable medical basis for the attesting physician's finding
that Mr. Hirschbein did not have aortic stenosis with an aortic
valve area less than 1.0 square centimeter by the Continuity
Equation.  Specifically, Dr. Vigilante concluded:

> I reviewed Claimant's echocardiogram of
> November 3, 2010....  This was a fair quality
> study with the usual echocardiographic views
> obtained.  The Nyquist limits were
> appropriately set.  There was appropriate
> evaluation of the left ventricular outflow
> tract velocity by pulse wave Doppler and
> adequate evaluation of the increased velocity
> across the stenotic aortic valve with
> continuous wave Doppler.
>
> Evaluation of the aortic valve demonstrated
> that this was a heavily calcified structure
> with marked restriction of aortic leaflet
> excursion on all views including parasternal
> long-axis, parasternal short-axis, and apical
> long-axis views.  In the parasternal
> long-axis view, the left ventricular outflow
> tract height was 2.0 cm....  Doppler
> evaluation of the aortic valve in the apical
> views was appropriate.  Loop 55 demonstrated
> the peak velocity across the stenotic aortic
> valve.  There were four cardiac cycles
> demonstrating the velocity.  All of them
> showed a high velocity.  The best envelope
> was noted in the first cardiac cycle and this
> was appropriately used by the sonographer for
> tracing the velocity time interval ("VTI").
> Continuous wave Doppler evaluation in the
> other three cardiac cycles were the same
> velocity although the envelope was not as
> intense.
>
> I disagree with Dr. Muttreja and Dr. Dlabal
> that the other velocities were lower.  My
> independent measurements and calculations of
> the Continuous Wave Doppler across the aortic
> valve found to a peak velocity of 3.6 m/sec
> and a VTI of 0.85 m.  Review of the pulse

wave Doppler in the left ventricular outflow
tract demonstrated that this was best
evaluated in loop 56 as documented by
Dr. Dlabal.  Indeed, this was the same image
used by the sonographer for calculations of
the peak velocity and the VTI in the left
ventricular outflow tract.  My independent
evaluation of this velocity demonstrated that
the peak velocity was 1.1 m/sec and the VTI
was 0.25 m.  Therefore, my calculation of the
aortic valve area using the Continuity
Equation was 0.92 cm2 which is less than
1.0 cm2.  It should be noted that the
sonographer's calculation of the VTI in the
left ventricular outflow tract was 0.24 m and
the calculation of the VTI through the aortic
valve was 0.84 m which correspond very well
to my independent measurements and
calculations.  Even if the less accurate peak
velocities rather than velocity time
integrals are used in the Continuity
Equation, the calculated aortic valve area is
still less than 1.0 cm2.  My calculations
correspond well with those performed by the
sonographer on this study.  The sonographer
used the highest representative continuous
wave Doppler across the stenotic aortic valve
as well as the highest representative
velocity in the left ventricular outflow
tract.  The sonographer's calculations of the
peak velocities and VTI's are very similar to
my calculations.  In her Declaration,
Dr. Penkala appropriately used the peak
velocity of 3.59 m/sec in her calculation of
the aortic valve area.  However, she
inappropriately used a lower left ventricular
outflow tract velocity of 0.9 m/sec in her
calculation.  The correct left ventricular
outflow tract velocity was 1.1 m/sec.

Dr. Muttreja was incorrect stating that the
highest gradient across the aortic valve was
over-traced by the technician.  The
technician performed correct calculations.
The signals in loop 55 showed similar
velocities although the envelope is not as
dense.  Dr. Dlabal was incorrect using an
aortic valve velocity of 2.9 m/sec from loop
55.  He was incorrect in stating that the
three other beats on loop 55 had much lower
velocities.  Indeed, these three other beats

had the same velocities as the first beat.
However, I do agree with Dr. Dlabal's
evaluation of the left ventricular outflow
tract velocity from loop 56 and, indeed, I
used this loop in the calculation of the
aortic valve area using the Continuity
Equation.  It should be also noted that the
finding of a 40 mm peak-to-peak gradient on
cardiac catheterization is different than a
peak gradient found on echocardiography.  In
addition, the echocardiographic and cardiac
catheterization studies were performed at
different times and under different
conditions.

In response to the Technical Advisor Report, claimant
argues that Dr. Vigilante substituted his own opinion for that of
the attesting physician rather than apply the reasonable medical
basis standard.  In addition, claimant contends that the
Technical Advisor did not consider Dr. Penkala's and Dr. Dlabal's
left ventricular outflow tract diameter or the aortic valve
velocities in loop 57, and that Dr. Vigilante did not record his
findings.  Finally, Mr. Hirschbein asserts that Dr. Vigilante
failed to average the aortic valve velocities from a number of
beats in order to obtain a representative measurement and failed
to use normal clinical judgment and accepted medical standards.
In particular, Mr. Hirschbein argues that Dr. Vigilante erred
because he expressed his measurements to the tenth place rather
than to the hundredth place.

After reviewing the entire show cause record, we find
claimant has failed to meet his burden of demonstrating that he
is entitled to Matrix A-1 benefits.  The Settlement Agreement
requires that a claim for benefits based on damage to the aortic

valve be reduced to Matrix B-1 if claimant had aortic stenosis
with an aortic valve area less than 1.0 square centimeter by the
Continuity Equation.  <u>See</u> Settlement Agreement
§ IV.B.2.d.(2)(c)i)e).

Here, the report of claimant's November 3, 2010
echocardiogram notes that Mr. Hirschbein had "aortic stenosis"
with an "aortic valve area of 0.9 cm square."  Although
Dr. Muttreja and Dr. Dlabal contend the that the technician who
performed his November 3, 2010 echocardiogram over-traced the
highest gradient, Dr. Penkala reviewed the echocardiogram and
determined that "the signal that the technician chose to trace
has a very representative peak velocity ...."  She explained,
"[T]he peak velocity by visual estimate on each signal is very
consistent ...."[9]  Dr. Vigilante also concluded that "[t]he
technician performed correct calculations."  According to
Dr. Vigilante, "The signals in loop 55 showed similar velocities
although the envelope is not as dense."

Moreover, the auditing cardiologist and the Technical
Advisor independently determined that claimant's aortic valve
area was less than 1.0 square centimeter.  Specifically,
Dr. Penkala concluded that Mr. Hirschbein's aortic valve area was
less than 0.9 cm$^2$.  Dr. Vigilante similarly found that

---

9.  Thus, we reject claimant's argument that Dr. Vigilante
improperly concluded that the velocity was the same in three of
the cycles or that he needed to average the aortic valve
velocities from a number of beats to obtain a representative
measurement.

-14-

Mr. Hirschbein's "aortic valve area using the Continuity Equation was 0.92 cm2" and that "[a]n echocardiographer could not reasonably conclude that the aortic valve area was greater than 1.0 cm2 on [claimant's November 3, 2010] study even taking into account inter-reader variability when appropriate measurements and calculations were performed on the proper Doppler images."[10]

For the foregoing reasons, we conclude that claimant has not met his burden of proving that there is a reasonable medical basis for finding that he did not have aortic stenosis with an aortic valve area of less than 1.0 square centimeter by the Continuity Equation.  Therefore, we will affirm the Trust's denial of Mr. Hirschbein's claim for Matrix A, Level III benefits and the related derivative claim submitted by his spouse.

---

10.  For this reason as well, we reject claimant's assertion that Dr. Vigilante substituted his own opinion for that of the attesting physician.